UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID MALADY,                        )
                                     )
                 Petitioner,         )
                                     )
        v.                           )    No.  4:02CV802 FRB
                                     )
DAVID DORMIRE,[1]                    )
                                     )
                 Respondent.         )


**MEMORANDUM AND ORDER**

This cause is before the Court on Missouri state prisoner David Malady's pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

On October 29, 1997, a jury in the Circuit Court of Madison County, Missouri, found petitioner guilty of Murder Second Degree, Robbery First Degree, Armed Criminal Action, and Burglary First Degree.  (Resp. Exh. A at 87-90.)  Subsequent to the return of verdict, the State dismissed the count of Armed Criminal Action.  (Resp. Exh. B-2, Sent. Tr. at 2.)  As to the remaining counts, on

---

[1]Petitioner is currently incarcerated at Southeast Correctional Center in Charleston, Missouri.  Inasmuch as Chuck Dwyer, Superintendent of Southeast, is petitioner's current custodian, he should be substituted for David Dormire as proper party respondent. Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts.  Further, because petitioner is challenging sentences to be served in the future, Missouri Attorney General Jeremiah "Jay" Nixon should be added as a proper party respondent. Rule 2(b), Rules Governing Section 2254 Cases in the United States District Courts.

December 4, 1997, petitioner was sentenced to two terms of life imprisonment and a fifteen-year term of imprisonment, respectively, with such terms of imprisonment ordered to be served consecutively to each other and to other sentences petitioner was then currently serving. (Resp. Exh. A at 97-98; Exh. B-2, Sent. Tr. at 8.) On December 15, 1998, the Missouri Court of Appeals summarily affirmed petitioner's conviction and sentence. State v. Malady, 982 S.W.2d 775 (Mo. Ct. App. 1998) (per curiam). On April 30, 1999, petitioner filed a motion for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15, which was denied after an evidentiary hearing. (Resp. Exh. F.) The Missouri Court of Appeals affirmed the denial of petitioner's motion for post-conviction relief. Malady v. State, 41 S.W.3d 543 (Mo. Ct. App. 2001) (per curiam). Petitioner's Motion for Rehearing and/or Transfer to the Missouri Supreme Court was denied by the court of appeals on March 12, 2001. On April 24, 2001, the Missouri Supreme Court denied petitioner's Application to Transfer. Petitioner pursued no other action in state court. The instant petition for writ of habeas corpus, signed by petitioner on April 16, 2002, and received by this Court on May 31, 2002, upon transfer from the United States District Court, Western District of Missouri, was filed June 7, 2002, upon petitioner being granted leave to proceed in this cause in forma pauperis.

Petitioner is currently incarcerated at the Southeast

Correctional Center in Charleston, Missouri.  In his petition for writ of habeas corpus, petitioner raises four claims for relief:

> (1)   That the trial court's admission of hearsay statements of the victim denied petitioner his right to due process and his right to confront and cross examine witnesses;
>
> (2)   That the trial court abused its discretion in overruling petitioner's objections and in failing to declare a mistrial _sua_ _sponte_ when Officer Campbell testified as to petitioner's "falsified statement" and his observation and interpretation of petitioner's nonverbal communication, thereby denying petitioner his right to due process and to a fair trial before a fair and impartial jury;
>
> (3)   That the trial court abused its discretion in overruling petitioner's objections to Officer Campbell's testimony relating to his opinion as to the state of petitioner's wounds on his right hand, thereby denying petitioner his right to due process and a fair trial before a fair and impartial jury; and
>
> (4)   That petitioner's conviction violated his right to due process in that the instructions as read and given to the jury permitted the jury to convict without finding petitioner to have committed all elements of the offense(s).

In response, respondent argues that the claims raised are without merit and should be denied.

## I.  Timeliness of Petition

Although not raised by respondent, the undersigned notes that the record shows petitioner not to have filed the instant petition for writ of habeas corpus in a timely manner pursuant to 28 U.S.C. § 2244(d)(1) inasmuch as direct review of petitioner's

conviction and sentence concluded more than one year prior to the filing of the petition.[2]

Pursuant to 28 U.S.C. § 2244(d)(1)(A), a person in custody pursuant to the judgment of a state court has one year from the date upon which such judgment became final within which to submit an application for writ of habeas corpus in federal court under 28 U.S.C. § 2254.  For purposes of the statute, the state judgment is final upon "the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  Judgment becomes final, and thus the one-year statute of limitations is triggered, by either:

> (I)  the conclusion of all direct criminal appeals in the state system, followed by either the completion or denial of certiorari proceedings before the United States Supreme Court; or (ii) if certiorari was not sought, then by the conclusion of all criminal appeals in the state system followed by the expiration of the time allotted for filing a petition for the writ.

Smith v. Bowersox, 159 F.3d 345, 348 (8th Cir. 1998).

Because petitioner did not file a petition for writ of certiorari in this cause, his state court judgment became final upon the expiration of his time to file such a petition.  Id.; see also Nichols v. Bowersox, 172 F.3d 1068, 1072 (8th Cir. 1999) (en banc).

---

[2]The failure to timely file a habeas petition is an affirmative defense which must be raised by the State or it is considered waived.  See Scott v. Collins, 286 F.3d 923 (6th Cir. 2002).

Under United States Supreme Court Rule 13, a petitioner has ninety days from the entry of the judgment sought to be reviewed within which to petition the Supreme Court for a writ of certiorari. In Nichols, the Eighth Circuit determined that a petitioner who failed to seek discretionary review by the state court of last resort, such as the petitioner here, has ninety days after his conviction was affirmed on direct appeal to seek certiorari. Nichols, 172 F.3d at 1072; see State v. Nichols, 915 S.W.2d 795 (Mo. Ct. App. 1996) (per curiam) (no filing of post-opinion applications for discretionary review). As such, upon consideration of Smith and Supreme Court Rule 13, the Eighth Circuit stated "with certainty" that such a petitioner's "judgment [becomes] final within the meaning of § 2244(d)(1)(A) *no earlier* than . . . exactly 90 days after his conviction was affirmed on direct appeal." Nichols, 172 F.3d at 1072 (emphasis added). In this cause, petitioner's conviction was affirmed on direct appeal on December 15, 1998. Inasmuch as petitioner did not file a petition for writ of certiorari, his state court judgment became final on March 15, 1999, ninety days after his conviction was affirmed on direct appeal. Nichols, 172 F.3d at 1072; Smith, 159 F.3d at 348. As such, the one-year period within which petitioner had to file a petition for writ of habeas corpus under 28 U.S.C. § 2254 commenced March 15, 1999.

Under 28 U.S.C. § 2244(d)(2), however, the one-year

limitation period for filing a federal habeas petition is tolled while "a properly filed application for State post-conviction or other collateral review ... is pending." <u>Williams v. Bruton</u>, 299 F.3d 981, 982 (8th Cir. 2002). The pendency of post-conviction review includes the time between the trial court's denial of post-conviction relief and the filing of an appeal from the denial, <u>Beery v. Ault</u>, 312 F.3d 948, 950 (8th Cir. 2002); and the time during the appeal process, including such time during which petitioner could seek further appellate review, <u>Carey v. Saffold</u>, 536 U.S. 214, 219-21 (2002); <u>cf.</u> <u>Williams</u>, 299 F.3d at 983 (final resolution of application for post-conviction relief does not occur until it is too late to proceed in appeal process). The ninety days within which to file a petition for writ of certiorari to the United States Supreme Court after the denial of post-conviction relief is not tolled, however. <u>Jihad v. Hvass</u>, 267 F.3d 803, 805 (8th Cir. 2001).

Petitioner filed a motion for post-conviction relief on April 30, 1999, thereby triggering the tolling provision of § 2244(d)(2). All appellate review of the motion ended on April 24, 2001, when the Missouri Supreme Court denied petitioner's Application to Transfer, thereby ending the tolling of the one-year limitations period. <u>Williams</u>, 299 F.3d at 983; <u>Peterson v. Gammon</u>, 200 F.3d 1202, 1203 (8th Cir. 2000). In the circumstances of this cause, then, the limitations period was tolled from April 30, 1999,

through April 24, 2001.  The instant petition was signed by petitioner on April 16, 2002,[3] 357 days after the conclusion of appellate review of his post-conviction motion.

Notably, the time between the date that direct review of a conviction is completed and the date that an application for state collateral relief is filed counts against the one-year limitations period.  Painter v. Iowa, 247 F.3d 1255, 1256 (8th Cir. 2001).  As such, the time between March 15, 1999 (the date petitioner's conviction became final), and April 30, 1999 (the date petitioner filed his post-conviction motion), is not tolled and must be included in the period within which petitioner could file a federal habeas petition.  Therefore, this forty-six day period counts against the one-year limitations period.  Totaling this period with the 357-day period which elapsed subsequent to the conclusion of post-conviction appellate review, the sum of 403 days had elapsed prior to the filing of the instant habeas corpus petition.  On the record before the Court, therefore, it appears that the instant petition was untimely filed under 28 U.S.C. § 2244(d).  In addition, review of the record fails to show any "extraordinary circumstances" which made it impossible for petitioner to timely file his petition.  Accordingly, it would

_____

[3]According petitioner the benefit of the prison mailbox rule, see generally Nichols v. Bowersox, 172 F.3d 1068 (8th Cir. 1999), the undersigned considers the instant petition to have been filed April 16, 2002, the date on which such petition was verified by petitioner.

appear that equitable tolling is not justified in this cause.  See Gray v. Gammon, 283 F.3d 917, 918 (8th Cir. 2002) (per curiam); Paige v. United States, 171 F.3d 559, 561 (8th Cir. 1999) (equitable tolling may be proper in habeas context where extraordinary circumstances beyond petitioner's control shown).

As noted above, however, respondent failed to address the timeliness of the instant petition and instead chose to defend the petition on the merits of the claims.  In light of this waiver of the affirmative defense, and inasmuch as the face of the petition itself is inconclusive as to the timeliness of the petition,[4] the Court must continue to address the claims raised in petitioner's petition for writ of habeas corpus.  See Nardi v. Stewart, 354 F.3d 1134 (9th Cir. 2004); Scott v. Collins, 286 F.3d 923 (6th Cir. 2002); Kiser v. Johnson, 163 F.3d 326 (5th Cir. 1999).  But see Long v. Wilson, 393 F.3d 390 (3d Cir. 2004) (magistrate judge may raise statute of limitations issue, sua sponte, in early stages of habeas case, even after answer is filed; State subsequently filed amended answer with affirmative defense raised).

## II.  Exhaustion Analysis

A petitioner must exhaust his state law remedies before the federal court can grant relief on the merits of his claims in

---

[4]Rule 4, Rules Governing Section 2254 Cases in the United States District Courts, permits the district court to sua sponte dismiss a habeas petition if, prior to ordering the State to respond, "it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief[.]"

a habeas petition.  28 U.S.C. § 2254(b)(1); O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).  The Court must first look to see whether the federal constitutional dimensions of the petitioner's claims have been fairly presented to the state court.  Smittie v. Lockhart, 843 F.2d 295, 296 (8th Cir. 1988); see also Boerckel, 526 U.S. at 848.  If not, the petitioner may still meet the exhaustion requirement if there are no currently available non-futile state remedies by which he could present his claims to the state court.  Smittie, 843 F.2d at 296.  When the petitioner's claims are deemed exhausted because he has no available state court remedy, the federal court still cannot reach the merits of the claims unless the petitioner demonstrates adequate cause to excuse his state court default and actual prejudice resulting from the alleged unconstitutional error.  Coleman v. Thompson, 501 U.S. 722 (1991); Wainwright v. Sykes, 433 U.S. 72, 87 (1977); Keithley v. Hopkins, 43 F.3d 1216, 1217 (8th Cir. 1995); Stokes v. Armontrout, 893 F.2d 152, 155 (8th Cir. 1989).  Before reviewing any claims raised in a habeas petition, the Court may require that every ground advanced by the petitioner survive this exhaustion analysis.  Rhines v. Weber, ___ U.S. ___, 125 S. Ct. 1528 (2005).

A review of the record shows petitioner's claims to be exhausted inasmuch as petitioner properly raised the claims in state court.

### III. Merits of the Claims

Section 2254(d)(1) requires federal habeas courts to test the determinations of state courts "only against 'clearly established Federal law, as determined by the Supreme Court of the United States,'" and prohibits the issuance of a writ of habeas corpus "unless the state court's decision is 'contrary to, or involved an unreasonable application of,' that clearly established law." <u>Williams v. Taylor</u>, 529 U.S. 362, 379 (2000). The federal law must be clearly established at the time petitioner's state conviction became final, and the source of doctrine for such law is limited to the United States Supreme Court. <u>Id.</u> at 380-83.

A state court's decision is contrary to clearly established Supreme Court precedent when it is opposite to the Court's conclusion on a question of law or different than the Court's conclusion on a set of materially indistinguishable facts. <u>Williams</u>, 529 U.S. at 412-13; <u>Carter v. Kemna</u>, 255 F.3d 589, 591 (8th Cir. 2001). A state court's determination is an unreasonable application of Supreme Court precedent if it unreasonably refuses to extend a legal principle to a new context where it should apply. <u>Carter</u>, 255 F.3d at 592 (citing <u>Williams</u>, 529 U.S. at 407). "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at 410-11).

The undersigned notes that on direct appeal, the Missouri

Court of Appeals affirmed petitioner's conviction and sentence in a cursory manner finding that no jurisprudential purpose would be served by an extended opinion. <u>Malady</u>, 982 S.W.2d at 775. This Court is therefore without the benefit of any extended analysis by which the Missouri Court of Appeals made its determination that petitioner was not entitled to relief on any of the claims properly brought before it. However, the absence of any legal analysis by the state court "does not mean that [petitioner] is necessarily entitled to habeas relief[.]" <u>Huss v. Graves</u>, 252 F.3d 952, 956 (8th Cir. 2001). Relief may be granted only if the decision of the state court is "substantially different" from what the decision would have been if that court had used the appropriate legal standard as established by the United States Supreme Court. <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at 405). As such, this Court must apply such established Supreme Court precedent to the facts of this case to determine whether petitioner is entitled to relief on any of his claims. <u>Id.</u>

In this cause, petitioner was charged with, convicted of and sentenced for Murder Second Degree, Robbery First Degree and Burglary First Degree. On post-conviction appeal, the Missouri Court of Appeals summarized the relevant facts adduced at trial as follows:

> Gladys Hehner, the victim, was eighty-two years old and lived alone in her home at 1134 Spruce in Bismark. Ms. Hehner's grandson,

William Goad, checked on her daily.

On April 9, 1996, Movant, Greg Snyder, and Herbert Blackwell gathered at a friend's apartment. Around midnight, they left and drove around discussing how they could acquire a television. Blackwell suggested that they take Ms. Hehner's television. Blackwell and Snyder occasionally performed yardwork for Ms. Hehner. Blackwell dropped Movant and Snyder off at Ms. Hehner's house. Movant cut the phone line outside the house, then he and Snyder kicked in the front door and began to look around. When they heard Ms. Hehner wake up, they went to the spare bedroom and went out a back window.

Movant, Snyder and Blackwell decided to get masks, gloves and dark clothing so they could go back to the house and take the television and microwave. They purchased three stocking caps at Wal-Mart, then created eye holes in them. They changed into dark clothing at a 7-11 store. As they walked across yards to Ms. Hehner's house, Movant found a baseball bat and picked it up. They also carried a pellet gun and two flashlights.

Movant, Snyder and Blackwell returned to Ms. Hehner's house at around four o'clock in the morning. At the back of the house, Movant pulled out the electrical meter box. The three then entered through the front door that they had kicked in earlier. Blackwell and Snyder began to disconnect the television. When Ms. Hehner came out of her bedroom, Snyder pointed the pellet gun at her and told her to go back to the bedroom, which she did.

Movant went into the bedroom and began to beat Ms. Hehner. He demanded money. Blackwell stopped Movant and returned to disconnecting the television. Movant again beat Ms. Hehner about the head and face with his fists and demanded money. She told him that she did not have any money and asked to be left alone. Movant angrily smashed a porcelain soap dish on the floor then sprayed

insect repellant into Ms. Hehner's eyes. Eventually, Snyder and Movant went through the bedroom looking for money and found two jars containing some change. At one point, Ms. Hehner's dog tried to bite Movant and Blackwell stabbed it with a knife. He then left the knife in the kitchen sink.

The three men ransacked Ms. Hehner's house. Before they left, Movant insisted that Snyder and Blackwell hit Ms. Hehner so that they "would all have equal share in what was being done." Movant told Snyder that he would make him "look like her" if he did not hit her. Snyder hit her twice. Then the three men left with the television, the change and a portable stereo. Movant decided to go back in and get the microwave. When he returned, they loaded the purloined goods into the car and took them back to the apartment where Snyder was staying. They took the change and went to Hardee's and McDonald's to spend it.

Ms. Hehner's grandson found her when he came by at about seven-fifteen in the morning. She was severely bruised on the face, neck and chest. Her nose and two other facial bones were fractured. After five days in the hospital, she went home with her daughter. However, after about eight days she developed breathing difficulty and was re-admitted to the hospital. On April 28, 1996, Ms. Hehner died of subdural hemotoma [sic] as a result of the blunt head trauma inflicted during the burglary and robbery. A blood clot covered half of her brain, between the skull lining and the surface of the brain. The additional pressure on the cerebrum caused Ms. Hehner to stop breathing.

A witness came forward to tell police that she had seen Snyder at the 7-11 store just before midnight on April 9, 1996. She said that Snyder was wearing dark clothes and carrying other clothes.

After receiving this information, police went to the apartment where Snyder was

staying. When they knocked on the door, Movant answered and let them in. The officers found Ms. Hehner's microwave and television in the kitchen. Snyder and Movant were arrested at that point. The knuckles of Movant's right hand were bruised and swollen. Snyder's roommates later turned in two stocking cap masks, some dark clothing, two pairs of gloves and Movant's black trench coat to police.[5]

Police apprehended Blackwell at a supermarket. The officers found the pellet gun, the baseball bat, dark clothing and the third stocking cap mask in his car.

Snyder and Blackwell admitted their involvement and implicated Movant. Movant's first statement to police was inconsistent with their accounts. Movant made a second statement that conformed to the other evidence. In that statement, Movant admitted his involvement, although he attempted to minimize his role.

Movant did not testify at trial. He presented the testimony of one witness who claimed to have been with movant in Park Hills throughout the night of the crime. Movant presented another witness in support of his defense who testified that movant filled out a Modern Day Veteran's membership application at an unknown time.

At the close of the evidence and following the instructions and arguments of counsel, the jury returned verdicts of guilty as charged on all four counts. At the sentencing hearing on December 4, 1997, the prosecutor *nolle prosequied* the armed criminal action count.

(Resp. Exh. K, Memo. at 2-5.)

---

[5]Evidence adduced at trial showed petitioner as well to have resided at this apartment during the relevant time period.

Inasmuch as petitioner does not rebut these factual findings by clear and convincing evidence, they are presumed to be correct. 28 U.S.C. § 2254(e)(1).

A.    Ground 1 - Hearsay Testimony

In his first ground for relief, petitioner contends that the trial court erred in admitting the hearsay statements of the victim, thereby denying petitioner his right to due process and his right to confront and cross examine witnesses. A review of the record shows petitioner to have fairly presented this claim to the state court by raising it on direct appeal (Resp. Exh. C), which the Missouri Court of Appeals summarily denied. Malady, 982 S.W.2d at 775.

Petitioner specifically challenges testimony adduced from the victim's daughter, Ms. Goad, that upon being admitted to a hospital room from the emergency room, Ms. Hehner told her how she sustained her injuries:

> A.    She told me that three people had broken in her home. . . . She believed that she had scared them out the first time but that they came back and confronted her back in her bedroom and were wanting to know where her money was.
>
> Q.    Did she mention anything about any weapons?
>
> A.    She said that there was three of them and that they had a bat and they kept beating her with the bat asking where's the money.

        Q.    Did she also say anything about fists?

        A.    She said they just kept hitting her.

(Resp. Exh. B-1, Trial Tr. at 187-88.)

        Q.    [W]hen you were talking to her in the,
               not in the emergency room but when she
               was admitted and she told you about the
               attack, did she mention anything about
               anything else being done to her other
               than the bat?

               . . .

        A.    She did mention at one point that they
               had sprayed bug spray in her eyes.

(Id. at 198-99.)[6]

Ms. Goad further testified that she relayed this information to the police. (Id. at 189, 199.) This testimony was the subject of petitioner's pretrial motion in limine and continuing objection during trial on the basis that it constituted inadmissible hearsay, that is, that it introduced statements made by an out-of-court declarant which were offered for the truth of the matter asserted. Petitioner argued that such statements failed to meet the "dying declaration" exception to hearsay inasmuch as there was no evidence of the victim's consciousness of impending death at the time the

---

[6]To the extent petitioner complains that Ms. Goad was permitted to also testify as to the victim's statements that "one boy kept asking her where the money was" and "the boys were in her room with a flashlight," and as to the physical description of the assailants, the undersigned notes that such statements were elicited by defense counsel during cross examination. (Resp. Exh. B-1, Trial Tr. at 201-02.)

statements were made. Petitioner further argued that no other hearsay exceptions were applicable to the statements. (Resp. Exh. B-1, Trial Tr. at 6-8, 187.) The State responded that it intended to introduce such testimony to explain the conduct of the police in its investigation, and specifically, to explain why the police were searching for three individuals and a baseball bat. The State therefore argued that such statements were not hearsay inasmuch as they were not being introduced for the truth of the matter asserted. (<u>Id.</u> at 8-10, 187.) The trial court summarily overruled petitioner's motion in limine and objections to the testimony, with no reason given for its rulings. (<u>Id.</u> at 10, 187.) In its instructions to the jury at the conclusion of trial, however, the court included the following instruction:

> Evidence has been received that after she had been wounded the deceased made a statement concerning the circumstances under which she received the injuries which are alleged to have caused her death. If you find and believe from the evidence that the deceased made the statement and that it was made after she had been mortally wounded and after she had abandoned hope for recovery and believed that death was near, then you may consider the statement along with all of the other evidence in the case, giving it such weight as you believe it is entitled to receive.

(Resp. Exh. A at 84.)

As such, the jury was instructed to determine whether the victim's out-of-court statements were dying declarations, <u>see</u> <u>Shepard v.</u>

<u>United States</u>, 290 U.S. 96, 99 (1933), and, if so, was permitted to consider them with the evidence.

At the time petitioner's conviction became final, the law was clearly established that the Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. <u>Idaho v. Wright</u>, 497 U.S. 805, 813 (1990); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678-79 (1986). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." <u>Maryland v. Craig</u>, 497 U.S. 836, 845 (1990). Hearsay is, by definition, "a statement, other than one made by the declarant while testifying at the trial . . . offered in evidence to prove the truth of the matter asserted," and is not admissible except as provided by statute, rule and/or Supreme Court precedent. Fed. R. Evid. 801(c), 802. Hearsay statements may be admitted when 1) "the evidence falls within a firmly rooted hearsay exception" or 2) they contain "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statements' reliability. <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980).

The erroneous admission of hearsay statements does not result in a reversal of conviction, however, if the error was

harmless.  <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).  Under

<u>Chapman</u>, an error is harmless "only if there could be no reasonable

doubt that the error's admission failed to contribute to the jury's

verdict."  <u>United States v. Chapman</u>, 356 F.3d 843, 846 (8th Cir.

2004) (internal quotation marks and citation omitted).

"[V]iolations of the confrontation clause caused by improper

admission of hearsay statements are harmless beyond a reasonable

doubt when there is overwhelming evidence of defendant's guilt."

<u>United States v. Copley</u>, 938 F.2d 107, 110 (8th Cir. 1991).

In this cause, as shown by the trial court's instruc-

tions, the jury was permitted to consider the totality of Ms.

Hehner's statements as testified to by Ms. Goad, if such statements

constituted "dying declarations."

> Dying declarations are admissible on a
> trial for murder, as to the fact of the
> homicide and the person by whom it was
> committed, in favor of the defendant as well
> as against him. . . . But it must be shown by
> the party offering them in evidence that they
> were made under a sense of impending death.
> This may be made to appear from what the
> injured person said; or from the nature and
> extent of the wounds inflicted being obviously
> such that he must have felt or known that he
> could not survive; as well as from his conduct
> at the time and the communications, if any,
> made to him by his medical advisers, if
> assented to or under-standingly acquiesced in
> by him.  The length of time elapsing between
> the making of the declaration and the death is
> one of the elements to be considered, although
> . . . it is the impression of almost immediate
> dissolution, and not the rapid succession of
> death, in point of fact, that renders the

testimony admissible.

<u>Mattox v. United States</u>, 146 U.S. 140, 151 (1892) (internal quotation marks and citation omitted).

Despair of recovery may be gathered from the circumstances if the facts support the inference. <u>Shepard</u>, 290 U.S. at 100. "There is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered, though the period of survival outruns the bounds of expectation." <u>Id.</u> As set out below, a review of the entire trial transcript in this cause shows the circumstances here to support the admission of Ms. Hehner's statements as dying declarations.

Evidence and testimony adduced at trial showed Ms. Hehner to have been eighty-two years of age at the time of the attack. Ms. Hehner was frail, in poor health and was mobile only with the aid of a walker. Ms. Hehner had twisting of the spine and advanced osteoporosis, as evidenced by a significant deformity, <u>i.e.</u>, a hump to her back, which prevented her from lying in a prone position, and thus prevented her from having necessary examinations and/or procedures performed upon her admission to the hospital after the attack. The deteriorating nature of the victim's health in the first instance, when coupled with the nature of the attack itself and the wounds inflicted thereby, support an inference that at the time she made the challenged statements to her daughter, Ms. Hehner must have felt or known that she could not survive her injuries.

Specifically, evidence showed that after the attack, Ms. Hehner was discovered slouched in her chair and mumbling; her face was bruised and swollen, with one eye nearly swollen shut; the skin of one of Ms. Hehner's cheeks had been pulled and torn, and was detached from the area surrounding the eye; there was bruising about Ms. Hehner's throat, neck and chest; and she had blood over the front of her. Ms. Hehner was shocked and traumatized when found and initially objected to medical assistance. While in the emergency room at the hospital, Ms. Hehner was in and out of consciousness. Ms. Hehner suffered a fractured nose, right cheek bone, and right scapula. Ms. Hehner died eighteen days later. Autopsy results showed Ms. Hehner's brain to have detached from the right side of the skull as a result of severe blows to the head, thereby causing the resulting cavity to fill with blood.

While broken bones to the face and shoulder area may not cause an otherwise fit and healthy person to despair in recovery, it is reasonable to infer that an elderly person in Ms. Hehner's generally poor health condition would sense impending death subsequent to such a severe beating, with no hope of recovery. This is made even more apparent here, where Ms. Hehner was physically unable to undergo necessary tests to assist hospital personnel in determining the extent of her internal injuries. In the particular circumstances of this cause, the trial court was not unreasonable in its determination to permit the jury to consider,

as dying declarations, Ms. Hehner's statements to her daughter upon admission to the hospital from the emergency room. See <u>Palmer v. Clarke</u>, 408 F.3d 423, 429 (8th Cir. 2005) (writ of habeas corpus cannot be granted unless the state court decision is both wrong and unreasonable). Because dying declarations fall within a firmly rooted hearsay exception, the admission of such did not deny petitioner due process or his right to confront and cross examine witnesses. <u>Mattox</u>, 146 U.S. at 151-52.

Nevertheless, even if the admission of the alleged hearsay statements was error, such error was harmless beyond a reasonable doubt given the overwhelming evidence of petitioner's guilt, which included the testimony of another participant in the crime implicating himself and petitioner; evidence that within hours of the crime, the items stolen from the victim were found at petitioner's residence at and during a time when petitioner was present and upon which petitioner was then arrested; evidence that certain clothing worn by the perpetrators was found at petitioner's residence; and petitioner's subsequent admission to the crimes. These facts together support petitioner's conviction even without Ms. Goad's testimony regarding Ms. Hehner's description of the crimes committed against her. See <u>United States v. Wells</u>, 347 F.3d 280, 290 (8th Cir. 2003); <u>Copley</u>, 938 F.2d at 110. Indeed, Ms. Hehner's statements did not "point the finger of guilt" at petitioner nor arouse prejudice against him. Instead, petitioner's

involvement in the crime was established by independent testimony and evidence. Lam v. State of Iowa, 860 F.2d 873, 877 (8th Cir. 1988).

The claim raised in Ground 1 of the instant petition for writ of habeas corpus should be denied.

B. Grounds 2 and 3 - Erroneous Admission of Officers' Testimony

In his second ground for relief, petitioner claims that the trial court erred in overruling his objections and in failing to declare a mistrial sua sponte when the State elicited testimony from police officers as to petitioner's credibility. In Ground 3, petitioner claims that the trial court erred in overruling his objections when the State elicited testimony from a police officer that injuries to petitioner's right hand appeared "fresh." A review of the record shows petitioner to have fairly presented these claims to the state court by raising them on direct appeal (Resp. Exh. C), which the Missouri Court of Appeals summarily denied. Malady, 982 S.W.2d at 775.

Petitioner specifically challenges testimony adduced from Officer Campbell that he discarded the first page of petitioner's initial written statement made subsequent to his arrest because "it was a falsified statement." (Resp. Exh. B-2, Trial Tr. at 286.) The trial court sustained petitioner's objection to this testimony. (Id.) Petitioner also challenges Officer Campbell's direct testimony that scabs on the main knuckles of petitioner's right

hand appeared to be "fresh." (_Id._ at 289-90.) The trial court overruled petitioner's objection to this testimony. (_Id._ at 290.) In addition, petitioner challenges Officer Scott's testimony that petitioner's initial written statement "did not appear to be truthful." (Resp. Exh. B-2, Trial Tr. at 333-34.) The trial court did not specifically rule petitioner's objection to this testimony but instead instructed the prosecutor to "[a]sk another question." (_Id._ at 334.) Finally, petitioner challenges testimony adduced from Officer Scott regarding his interpretation of petitioner's nonverbal communication during interrogation:

> A.     My focus during the tape being played was
>        to watch Mr. Malady's eyes, hands, feet
>        and his –
>
> MS. MURPHY:     Your Honor I would object.
>                Never mind go ahead.
>
> THE COURT:      Go ahead and repeat your
>                answer.
>
> A.     I'm sorry it was to keep an eye on every
>        movement and every gesture, noon [sic]
>        verbal communication of Mr. Malady.
>
> Q.     And why were you doing that?
>
> MS. MURPHY:     No, I'm going to object if we
>                are going to get into the area
>                of non verbal communication.
>
> MR. ORZEL:      He can describe what he was
>                doing and why he was doing it.
>
> THE COURT:      Overruled.  You may answer.
>
> A.     As an interview interrogator for law
>        enforcement agencies, I have my training

- 24 -

background in kinetic behavior which is
the non verbal, non aggressive approach
of interview interrogation where you –
well our training is that approximately
60-75% of all speaking is non verbal.  It
comes through gestures.

MS. MURPHY:      Your Honor I object to the
                 lengthy narrative non respon-
                 sive answer.

THE COURT:       Sustained.   Just get to the
                 why.

A.     Sorry the teacher in me.

Q.     (By Mr. Orzel)  Why were you looking for
       that?

A.     I was looking to see if he was making any
       signs of anxiousness or lying or truth
       telling.

Q.     What did you observe?

A.     I observed anxiety.

Q.     As a trained interrogator, what does that
       tell you?

MS. MURPHY:      Your Honor I would object to
                 the conclusion with respect to
                 what anxiety of a person in
                 custody means.  This man is not
                 an expert with respect to that.

THE COURT:       Sustained.   He can just say
                 what he did after the observa-
                 tion.

(Resp. Exh. B-2, Trial Tr. at 352-53.)


In the instructions given to the jury, the court instructed that it

was to disregard any question to which an objection has been

sustained, to not speculate as to any answer which may have been

- 25 -

given to the question, and to disregard any answer or other matter which the court has directed it not to consider. (Resp. Exh. A at 67.)

At the time petitioner's conviction became final, the law was clearly established that the erroneous admission of evidence in a criminal trial does not mandate an automatic reversal of a conviction. Chapman v. California, 386 U.S. 18, 21-22 (1967). Instead, where such errors are alleged to have infringed upon a constitutional right, the Court may determine that the error was "harmless," that is, "the court [is] able to declare a belief that [the error] was harmless beyond a reasonable doubt." Id. at 24. When analyzing harmless error, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id. at 23. In Sullivan v. Louisiana, 508 U.S. 275, 278-82 (1993), the Supreme Court stated:

> [T]he question [Chapman] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which the jury *actually rested* its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

Id. at 279 (internal quotation marks and citations omitted).

Under Sullivan and Chapman, therefore, the Court must look to the basis upon which the jury rested its verdict and determine what effect the evidence had on the actual verdict. If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt. Sullivan, 508 U.S. at 279.

As discussed supra at Section III.A, there was overwhelming evidence of petitioner's guilt independent of the officers' challenged testimony relating to petitioner's demeanor, statement of alibi, and injuries to the right hand, thereby minimizing the role, if any, such testimony played in the jury's verdict. First, with respect to petitioner's written statement of alibi, a review of the State's cross examination of petitioner's alibi witnesses, coupled with the evidence adduced during the State's case in rebuttal, shows petitioner's alibi defense to have been discredited in its entirety, meaning that the officers' isolated testimony as to the falsity of petitioner's initial statement was only a small part of the record evidence relating to petitioner's credibility. See Juarez v. Minnesota, 217 F.3d 1014, 1017 (8th Cir. 2000). With respect to the condition of plaintiff's hand, a review of the record shows that photographs taken of petitioner's right hand upon his arrest were admitted into evidence, thereby permitting the jury to view petitioner's injuries as they existed at the time and to determine thereon whether such injuries appeared "fresh." Further, Snyder testified that in the

evening hours prior to the execution of the burglary, robbery and assault, he observed petitioner to have an Ace bandage wrapped about his right hand.  As such, to the extent the nature and "age" of petitioner's injuries were issues relevant to the jury's consideration of petitioner's guilt, there was evidence in addition to Officer Campbell's testimony upon which the jury could make such determination, thereby minimizing the role, if any, such testimony had in the jury's verdict.  See id.  Finally, the prosecutor here did not rely extensively on the now-challenged testimony in his closing argument.  Indeed, the prosecutor did not address in any respect the condition of petitioner's hand or his observed demeanor at the police station.  To the extent the prosecutor referred to the untruthfulness of petitioner's statement of alibi, such argument was based on Officer Campbell's testimony that his investigation showed petitioner's initial alibi to be unsupported and the complete lack of credibility of petitioner's alibi witnesses, rather than upon any officer's subjective belief as to the truthfulness of petitioner's statement. (Resp. Exh. B-2, Trial Tr. at 541, 557-59.)

        The trial court in this cause sustained various objections made by petitioner to the testimony he now challenges and appropriately instructed the jury not to speculate and/or consider testimony given in response to objected-to questions. Upon consideration of these instructions, coupled with the

overwhelming evidence of petitioner's guilt and the relative insignificance of the challenged testimony, the Court determines there to be no reasonable possibility that the testimony which petitioner complains was erroneously admitted might have contributed to petitioner's conviction. <u>Chapman</u>, 386 U.S. at 23. Because there is no reasonable doubt that the erroneous admission of any such testimony failed to contribute to the jury's verdict, such error, if any, was harmless and petitioner's conviction remains unaffected thereby. <u>Id.</u> at 24; <u>Chapman</u>, 356 F.3d at 846.

For the foregoing reasons, this Court finds the decision of the state court in denying petitioner relief on these claims, albeit cursory, not to be "substantially different" from what the decision would have been if that court had used the appropriate legal standard as established by the United States Supreme Court. The claims raised in Grounds 2 and 3 of the instant petition should therefore be denied. <u>Huss</u>, 252 F.3d at 956.

C.   <u>Ground 4 – Jury Instructions</u>

In his fourth claim for relief, petitioner contends that the jury instructions as given permitted the jury to convict him of Robbery First Degree and Murder Second Degree without finding him to have committed all elements of the offenses, thereby depriving petitioner of his right to due process and a fair trial. Petitioner fairly presented this claim to the state court by raising it on direct appeal (Resp. Exh. C), which the Missouri

Court of Appeals summarily denied.  Malady, 982 S.W.2d at 775.

At the time petitioner's conviction became final, the law was clearly established that in a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.  See Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979).  Nonetheless, not every deficiency in a jury instruction rises to the level of a due process violation.  The question, rather, is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'"  Boyde v. California, 494 U.S. 370, 378 (1990) (quoting Cupp, 414 U.S. at 146-47).  If the charge as a whole is ambiguous, the question is whether there is a "'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde, 494 U.S. at 380).  The fact that an instruction is allegedly incorrect under state law is not a basis for habeas relief.  Id. at 71-72.

In this cause, petitioner challenges the verdict director given for Robbery First Degree and the related verdict director for Murder Second Degree (Felony Murder).  Specifically, petitioner

claims that the verdict director for Robbery First Degree failed to require the jury to find either 1) that petitioner committed all of the required elements of the offense or 2) that petitioner aided and abetted another in committing all elements of the offense. Petitioner further claims that in the absence of a valid finding of guilt for Robbery First Degree, he could not be convicted of Felony Murder. As evidenced by the nature of petitioner's argument, petitioner looks only to the verdict director itself in asserting a constitutional violation. Upon examining the jury instructions in their entirety, however, it cannot be said that petitioner's conviction violates due process.[7]

Instruction No. 9 instructed the jury as to elements of Robbery First Degree as follows:

> As to [Robbery First Degree], if you find and believe from the evidence beyond a reasonable doubt:
>
> *First,* that on or about the 10th day of April, 1996, in the Count[y] of St. Francois, State of Missouri, the defendant, David Malady, and Greg Snyder and Herbert Blackwell, took a television set, stereo, microwave oven and U.S. currency, which was property was in the possession of Gladys Hehner, and
>
> *Second,* that defendant, David Malady, did so for the purpose of withholding it from

---

[7]Under Mo. Rev. Stat. § 569.090 (1977), "A person commits the crime of robbery in the first degree when he forcibly steals property and in the course thereof he, or another participant in the crime, (1) [c]auses serious physical injury to any person[.]"

the owner permanently, and

*Third,* that defendant, David Malady, or Greg Snyder or Herbert Blackwell, in doing so used physical force on or against Gladys Hehner for the purpose of forcing Gladys Hehner to deliver up the property, and

*Fourth,* that in the course of obtaining the property, the defendant, David Malady, or Greg Snyder or Herbert Blackwell, caused serious physical injury to Gladys Hehner, and

*Fifth,* that Greg Snyder or Herbert Blackwell were participants in the commission of the offense,

then you will find the defendant, David Malady, guilty under Count II of robbery in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

. . .

(Resp. Exh. A at 74-75.)

Petitioner complains that the instruction required the jury to find petitioner to have participated in only the conduct described in paragraphs *First* and *Second*; that a guilty verdict could have been returned without finding the petitioner to have engaged in the conduct described in paragraphs *Third* and *Fourth*; and that paragraph *Fifth* of the instruction omitted any reference to petitioner in its entirety, thereby permitting the jury to convict without finding petitioner to have participated in the offense.

- 32 -

Under paragraphs *First* and *Second,* the jury was required to find that petitioner, himself, took the property of Gladys Hehner and did so for the purpose of withholding it permanently from Ms. Hehner. While it is true that under paragraphs *Third* and *Fourth*, the jury was not required to find petitioner to have, himself, used physical force or to have, himself, caused serious physical injury, the jury was required to find that during the course of taking and withholding the property as set out in paragraphs *First* and *Second* in which the petitioner *did* participate, *either* petitioner, Snyder or Blackwell engaged in such conduct of physical force causing serious physical injury. Finally, in paragraph *Fifth*, the jury was required to find that either Snyder or Blackwell participated in the offense. This instruction therefore, in itself, required the jury to find that petitioner himself took the property of Ms. Hehner for the purpose of withholding it permanently *and* that either petitioner or another participant in the offense used physical force causing serious injury in the course of taking such property. Such statements accurately reflect the elements of Robbery First Degree as set out in Mo. Rev. Stat. § 569.020, which states, "A person commits the crime of robbery in the first degree when he forcibly steals property and in the course thereof he, or another participant in the crime, (1) [c]auses serious physical injury to any person[.]"

Further, when viewed in conjunction with Instruction No.

5, which states:

> A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

(Resp. Exh. A at 70),

it cannot be said that any alleged error in Instruction No. 9 so infected the entire trial that petitioner's resulting conviction violates due process. Indeed, when viewed in their entirety, the instructions as a whole guided the jury to find petitioner guilty of Robbery First Degree only if 1) petitioner took the property of Ms. Hehner, 2) petitioner took such property for the purpose of withholding it permanently from Ms. Hehner, 3) either petitioner or another participant for whose conduct petitioner was responsible used physical force in the course of the taking of such property, and 4) either petitioner or another participant for whose conduct petitioner was responsible caused serious physical injury thereby. By virtue of paragraph *Fifth*, the jury was required to find that either Snyder or Blackwell was a participant in the offense. Under Instruction No. 5, the jury could find petitioner to have been responsible for the conduct of Snyder and/or Blackwell. In addition, in light of the evidence adduced at trial as summarized by the Missouri Court of Appeals, <u>see</u> <u>supra</u> at pp. 11-14, there was

more than sufficient evidence to find that petitioner himself engaged in the conduct ascribed to Robbery First Degree and also to have been responsible for the actions of Snyder and/or Blackwell, thereby committing all elements of the offense of Robbery First Degree. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Inasmuch as a review of the instructions as a whole shows the jury to have convicted petitioner of the offense of Robbery First Degree only after finding petitioner to have committed all elements of the offense beyond a reasonable doubt, petitioner's related argument that the jury could not have convicted him of Felony Murder must fail.

To the extent petitioner raises an independent challenge that Instruction No. 7 permitted the jury to find petitioner guilty of Murder Second Degree (Felony Murder) without finding petitioner to have either himself caused the death of Ms. Hehner, or to have aided or abetted Snyder or Blackwell in causing the death of Ms. Hehner, such argument likewise fails.[8]  A review of the

---

[8]A person commits the crime of Murder in the Second Degree if he:

(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or

(2) Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

- 35 -

instructions given as a whole shows the jury to have been instructed that petitioner was responsible for the conduct of other participants in the offense if he acted with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aided or encouraged the other person(s) in committing it. In light of the evidence adduced at trial as summarized by the Missouri Court of Appeals, see supra at pp. 11-14, there was more than sufficient evidence to find that petitioner himself engaged in the conduct ascribed to Murder Second Degree and also to have been responsible for the actions of Snyder and/or Blackwell in causing the death of Ms. Hehner, thereby committing all elements of the offense of Murder Second Degree. See Jackson, 443 U.S. at 319.

---

Mo. Rev. Stat. § 565.021 (1984).

In petitioner's underlying criminal cause of action, Instruction No. 7 instructed the jury to find petitioner guilty of Murder Second Degree if it found beyond a reasonable doubt:

*First*, that defendant, David Malady, committed the felony of robbery in the first degree, as submitted in Instruction No. 9, and

*Second*, that defendant, David Malady, or Greg Snyder or Herbert Blackwell caused the death of Gladys Hehner by striking her in the head and causing her to die on April 28, 1996, and

*Third*, that Gladys Hehner was killed as a result of the perpetration or attempted perpetration of that robbery in the first degree[.]

(Resp. Exh. A at 72.)

To the extent petitioner argues that Missouri law required that other approved instructions be given in the circumstances of the offenses charged, a claim of instructional error under state law is not cognizable in federal habeas actions. Instead, this Court must determine whether the instructions as given violated petitioner's right to due process. <u>Estelle</u>, 502 U.S. at 71-72. For the reasons stated above, the instructions, when viewed as a whole, instructed the jury as to all elements of the offenses charged and required the jury to convict petitioner only if it found petitioner to have committed all elements of the offenses beyond a reasonable doubt. Upon review of the entire charge to the jury, there is no reasonable likelihood, on the evidence adduced at trial, that the jury applied the instructions in a way that violated the Constitution or which resulted in a conviction which violated petitioner's right to due process.

Accordingly, the decision of the state court in denying petitioner relief on his claim of instructional error, albeit cursory, was not "substantially different" from what the decision would have been if that court had used the appropriate legal standard as established by the United States Supreme Court. Nor was the state court unreasonable in its determination to deny petitioner relief on this claim. <u>Palmer</u>, 408 F.3d at 429. The claim raised in Ground 4 of the instant petition should therefore be denied. <u>Huss</u>, 252 F.3d at 956.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Chuck Dwyer, Superintendent of Southeast Correctional Center, is substituted for David Dormire as proper party respondent.

**IT IS FURTHER ORDERED** that Missouri Attorney General Jeremiah "Jay" Nixon is added as a proper party respondent.

**IT IS FURTHER ORDERED** that petitioner David Malady's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Docket No. 4) is dismissed without further proceedings.

**IT IS FURTHER ORDERED** that no certificate of appealability shall issue in this cause inasmuch as petitioner has failed to make a substantial showing that he has been denied a constitutional right.

_____
UNITED STATES MAGISTRATE JUDGE


Dated this  _27th_  day of September, 2005.